WITT, Appellant, v. REALIST, INC., Respondent.

*November 2—November 27, 1962.*

284

For the appellant there were briefs by *Wengert & Spenner* of Milwaukee, and oral argument by *Herbert A. Spenner*.

For the respondent there was a brief by *Foley, Sammond & Lardner, Marvin E. Klitsner,* and *Richard H. Miller,* all of Milwaukee, and oral argument by *Mr. Klitsner* and *Mr. Miller*.

WILKIE, J. The several issues involved in this case are as follows:

1. Is the plaintiff the real party in interest?

2. Was there a breach of the camera-purchase contracts either as to (a) required purchases of each type during the period from May 1, 1957, through December 31, 1958; or (b) sales by defendant outside of United States?

3. Was plaintiff denied a fair trial because he was denied a fair chance to brief and to argue orally his motion for judgment and present his cause to the court?

4. Was the trial court correct in dismissing defendant's counterclaim on its merits without costs but with a right in defendant to reassert it in any remand, rehearing, or retrial of the merits of the case and in any court whatsoever?

5. Was there error in the trial court's allowing defendant costs and attorney's fees of $5,000?

We will consider each of these issues in the order stated.

1. *Is the plaintiff the real party in interest?* The defendant claims that the plaintiff is not a real party in interest under sec. 260.13 of the Wisconsin statutes.[1] It bases this

---

[1] Sec. 260.13. "REAL PARTY IN INTEREST MUST PROSECUTE. Every action must be prosecuted in the name of the real party in interest except as otherwise provided in sec. 260.15." (The exceptions are not pertinent here.)

contention upon the fact that the plaintiff, on August 18, 1959, assigned his claim for damages against the defendant to a Mr. Horn. After this, on May 30, 1960 (subsequent to the commencement of this action on November 17, 1959) Mr. Horn in turn made a similar assignment to a firm known as "AGFA." Still later, there was a reassignment on December 16, 1960, from AGFA back to the plaintiff. All of these assignments took place in Germany. The defendant claims that since the second and third assignments did not take place prior to the commencement of the action they were ineffective and that because of the legal effect of the original assignment on August 18, 1959, the plaintiff is not the real party in interest. The initial assignment reads as follows (emphasis ours):

"Assignment.

"We have a claim for damages against:
"David White Company, Milwaukee, Wisconsin, USA, and Realist, Inc., Milwaukee, Wisconsin, USA,

*on account of which we will sue* in the United States of America.
*"We herewith assign the proceeds of the claim which will be adjudicated in favor of us* by the final judgment in this lawsuit to:
"Mr. Rolf Horn, Hamburg 36, Neuerwall 35, as security for all loans which he claims and might claim either personally or as owner of his firms or the firm Horn Bekleidungsindustrie G.m.b.H. against us.
"Hamburg, August 18, 1959
"Iloca Camera
"Wilhelm Witt

"Rolf Horn
"Horn Bekleidungsindustrie G.m.b.H.
"Horn."

Because the other two assignments were executed and delivered after the commencement of this action on November 17, 1959, they are of no consequence in this litigation. We

are left to consider the effect only of the above-quoted assignment of August 18, 1959. The law of the place of assignment (Germany), if proven, governs not only the validity of the assignment but the effect of the assignment as between the assignor and assignee.[2]

Defendant contends that whether or not the plaintiff is a real party in interest is to be determined by Wisconsin law. The defendant cites authorities to the effect that all matters relating to remedy, conduct of trial, and procedural matters are governed by the law of the forum.[3]

---

[2] Restatement, Conflict of Laws, p. 431, sec. 350, provides as follows: "ASSIGNMENT OF INFORMAL CONTRACT. The effect of an assignment of a contract right as between the assignor and the assignee is determined by the law of the place of assignment."

Goodrich, Conflict of Laws (hornbook series (3d ed.)), p. 341, sec. 113, states: "The assignment of a contract is a matter separate from the contracts which is the subject matter of the assignment. The validity of the assignment is governed by the law of the place where the assignment is made."

A contract, if valid where made, is valid everywhere. The only exception to this would be where there is legislative prohibition in the jurisdiction of the forum against a certain type of contract or a public policy against the making of such a contract. See *International Harvester Co. v. McAdam* (1910), 142 Wis. 114, 124 N. W. 1042.

[3] "The law of the forum determines the jurisdiction of the courts, the capacity of the parties to sue or to be sued, the remedies which are available to suitors and the procedure of the courts." *Mertz v. Mertz* (1936), 271 N. Y. 466, 473, 3 N. E. (2d) 597, 599.

Defendant cites *Oertel v. Williams* (1934), 214 Wis. 68, 71, 251 N. W. 465. In this case the court held that the law of the forum did cover all matters relating to the remedy, conduct of the trial, and evidence.

Stumberg, Conflict of Laws (2d ed.), p. 135, states: "Such matters as forms of action, parties to the suit, venue, and rules of practice and pleading are all customarily treated as procedural and are therefore controlled by the law at the forum."

Goodrich, *supra*, p. 229, sec. 82, states: "Matters pertaining to the form of action, in whose name suit is to be brought, order of liability, counterclaim and setoff, etc., are matters of procedure and governed by the internal law of the forum."

The law of the forum does apply to procedural matters. But the effect of an assignment on the rights of the assignor and assignee is a matter of substance to be governed by the law of the place of the assignment, if proven.[4]

Although sec. 260.13, Stats., is procedural in the sense that it provides that one has to be a real party in interest in order to sue, the question is substantive as to the right of a particular plaintiff to sue in the face of an assignment. Thus, we conclude that the German law, as the law of the place of contracting or of the assignment, governs as to the effect of that assignment on the substantive rights of the assignor (Witt) or the assignee (Horn) to sue on the claim.

The question therefore is, What are the rights of the respective parties under German law in view of the assignment? There was disputed testimony to the effect that the plaintiff had recently undergone a compromise proceeding with his creditors in Germany, the express purpose of which was to avoid bankruptcy. In any event, there was also testimony that under German law this proceeding did not affect the plaintiff's continued capacity to sue on this claim.

Foreign law is not a matter on which this court or the trial court is prepared to take judicial notice.[5] Foreign law is to be proven as are other facts on the trial. The plaintiff did meet his burden of proving what that law was on the subject of the effect of the attempted assignment.

Plaintiff made several attempts to prove the applicable German law through the expert testimony of Dr. Fritz G.

---

[4] The case of *McKnelly v. Brotherhood of American Yeomen* (1915), 160 Wis. 514, 152 N. W. 169, dealt with an insurance contract. The court there held that where a contract is not a Wisconsin contract when made, it is therefore not affected by Wisconsin law so far as contract rights are concerned. It follows that this same reasoning should apply to assignments.

[5] "We are not prepared to take judicial notice of the German laws." *Estate of Wieboldt* (1958), 5 Wis. (2d) 363, 373, 92 N. W. (2d) 849. See sec. 328.01, Stats. 1959.

Lorenz, a former member of the German supreme court. Every attempt was met by an objection and the trial court sustained the objections. In so doing he was in error.[6] The error was not prejudicial since Exhibit 23 (made a part of the record by stipulation between the parties as per the stipulation and order settling the bill of exceptions, dated May 7, 1962), being the applicable German statute and related annotations, establishes German law.[7]

Examining the assignment of August 18, 1959, in the light of the German statute and annotations, the plaintiff (assignor) expressly stated "we [Witt] will sue" and further

[6] Restatement, Conflict of Laws, p. 736, sec. 621, comment *a*, provides: "Foreign law is proved by the opinion of experts although by statute a court is sometimes permitted to receive in evidence the printed statutes and decisions of the courts of a foreign state to prove its law."

[7] Sec. 398 of the German Civil Code provides as follows: "A claim may be assigned by the creditor by agreement with another person to the latter (cession). From the conclusion of the agreement the new creditor (assignee) takes the place of the former creditor."

Annotations: "Note 8. (c) Dormant assignment. However, a valid assignment may be made in such a manner that externally to third parties the assignor still appears for the time being as the owner of claim, particularly as long as the assignor fulfils his obligation to the assignee; it results that particularly under these conditions the assignor alone is entitled to collect and that the debtor shall not be notified of the assignment (so-called dormant assignment); RG 90, 273, 276 seq; 133, 234, 242 seq; 136, 100, 102; 142, 139, 141; JW 1937, 3029 no. 15; JW 1938, 1329 no. 34; RAG 21, 167, 171; 25, 21, 23; BGH 26, 185, 191 seq. . . ."

"Note 36. . . . The essence of such dormant assignment is that in relation to third parties (externally) and particularly in relation to the debtor, not the assignee but the assignor furthermore appears as the owner of the claim and that he is also entitled to collect (compare *supra* note 8)."

"Note 38. . . . If the assignor—in case of a dormant assignment (see *supra* note 8) is further entitled to collect in his name, such power is legally to be considered an authorization to collect (RG 133, 234, 242; BGH 26, 31, 37; . . . ."

the proceeds of the claim are assigned "which will be adjudicated in favor of us by the final judgment in this lawsuit." This language clearly indicates an intention of the parties that the plaintiff as assignor was permitted, under German law, to sue on the claim and to continue such litigation.

We conclude, therefore, that the plaintiff was a real party in interest under sec. 260.13, Stats. Accordingly, the Finding of Fact No. 2, Conclusion of Law No. 2, and the related part of the judgment should be stricken.

2. *Was there a breach of the camera-purchase contracts either as to (a) required purchases of each type during the period from May 1, 1957, through December 31, 1958; or (b) sales by defendant outside of United States?*

A. *The Stereo Camera Contract.* The parties entered into a written contract on July 21, 1954, relating to two types of Stereo cameras, A and B. As pertinent here the parties (under paragraph 2) agreed that Witt was to deliver to the defendant all of the cameras the defendant "may require" after January 1, 1955, and during the life of the contract (to be terminated on December 31, 1957). Such deliveries were subject to express limitations, which provided that beginning January, 1955, Witt "shall be prepared to deliver" to White, and White "shall be prepared to accept delivery" at the rate of 1,000 type A's per month and 500 type B's per month. White reserved the right on notice to *accelerate* deliveries up to 25 percent by giving notice to Witt, provided deliveries did not exceed specified larger quantities. White also reserved the right on notice to *reduce* deliveries (not more than 30 percent) but not below the minimum quantities of 1,000 A's per month or 500 B's per month.

Paragraph 16 said nothing whatsoever about quantities but specified:

"16. *In the event White shall be unable to market the number of cameras to be delivered under this contract after having exerted its best efforts to do so,* then White shall have the right to terminate this agreement at the end of the sixth calendar month after the month in which White delivers notice to terminate. Such written notice under this paragraph may be delivered in any month after May, 1955. In the event of termination under this paragraph on December 31, 1955, White shall pay to Witt liquidated damages in the amount of $100,000, and in the event of termination at the end of any month after December, 1955, such liquidated-damage amount shall be reduced by $4,166.66 for each month elapsed after December, 1955."

The original contract thus set a *minimum* contract obligation for defendant to accept delivery of 500 B's per month and 1,000 A's per month. Plaintiff's contention that "minimums" are set by paragraph 16 and not paragraph 2 is totally wrong; paragraph 16 deals with "liquidated damages" *in the event minimum quantities are not purchased.*

But there were amendments to the agreement.

*First Amendment.* On March 18, 1955, a change was agreed to based on the proposition that the defendant wanted to be relieved of any obligations to buy type B cameras and, to the extent relieved, defendant in exchange agreed to buy a correspondingly increased number of type A. Paragraph 16 was added to and the *change made was to apply only when the minimums under paragraph 2 were not met.* The amended paragraph merely made it clear that if Witt was called on to deliver less B's, then White would take that many more A's (up to 1,500). The parties agreed that if Witt failed to meet requirements and fell off on deliveries of A's below 1,500, then he would lose $2 on the price of each camera. Thus his liquidated damages would be reduced and the only way he could be assured of $3,000 liquidated damages would be where the defendant took 1,500 A's (instead of 500 B's and 1,000 A's) and Witt was actually able to deliver them. The

original unit contract price for type A was $23. The net effect of this change was that if White failed to perform and take delivery on its minimum of 1,500 cameras, Witt would receive liquidated damages of $2 for each camera delivered. Paragraph 2 was not superseded or replaced by this change, but made more explicit.

*Second Amendment.* There was a letter of September 7, 1955, covering the situation before January 1, 1956, and all controversy here is on requirements *after* that date and hence this amendment is not material to this case.

*Third Amendment.* On January 1, 1956, there was another and final change that completely replaced paragraph 2 and under the new 2 (a) deliveries before May 1, 1957, were covered specifying the exact quantity of types A and B to be delivered in each month through April, 1956 (all deliveries were made and paid for), and calling for a one-year moratorium with no deliveries from May 1, 1956, through April 30, 1957, unless a special order was entered by the defendant.

As to deliveries after May 1, 1957, paragraph 2 (b) expressly provided as follows:

"(b) *Deliveries on and after May 1, 1957.* Independently, and without regard to or effect upon the foregoing provisions of paragraph 2 (a) *deliveries for the period commencing May 1, 1957, and thereafter* during the remainder of the contract term *shall be as mutually agreed* upon by the parties in negotiations which shall commence on or about January 10, 1957, and which shall be carried on in good faith and with due diligence. *The parties recognize the necessity of continuous study and improvement* of cameras so that any cameras delivered hereunder after May 1, 1957, will be *competitive* in *performance, quality, design, and price* with similar competitive products of others." (Emphasis added.)

The agreement of January, 1956, also extended the termination date of the contract one year to December 31, 1958.

It then provided that except for the changes made in the original contract, that agreement stood as written.

There were no other changes. There is no dispute that the agreement was not terminated and plaintiff has sued because defendant took no cameras between May 1, 1957, and the expiration date of the contract, December 31, 1958. Plaintiff complains that defendant has failed to accept the required number of cameras with a loss of profits to the plaintiff totaling $232,500.

To support his theory of the contract, plaintiff contends that in a letter dated August 31, 1956, there was a recognition by the defendant that paragraph 16 controls because defendant paid $3,600 liquidated damages for 1,800 cameras delivered from January through April of 1956. But these cameras were the cameras called for by paragraph 2 (a) of the January 1, 1956, amendment and not by paragraph 16 of the main contract. In a letter dated July 11, 1956, defendant agreed to pay this sum under what it contended to be "duress" in order to be sure plaintiff would deliver urgently needed spare parts, and 231 repaired cameras belonging to defendant. The letter said that payment was being made "without waiver or prejudice to either party of any claims against the other . . . ." This is no acceptance of paragraph 16 by the defendant as controlling his minimum obligation to plaintiff.

B. *The 35-MM. Contract.* The parties entered into a second contract on May 10, 1954, relating to 35-mm. cameras. This contract was substantially the same as the Stereo contract. Again paragraph 2 covered quantities and called on Witt to deliver and White to accept 1,000 A's per month and 500 B's. There was no paragraph similar to paragraph 16. There were also changes in this contract.

*First Amendment.* The first supplemental agreement was dated July 29, 1954, which did not make any change in the

quantity requirements of the contract and merely provided that the defendant could terminate the contract and if so liquidated damages were prescribed.

*Second Amendment.* Further change was embodied in a letter of August 26, 1955, as follows:

"Beginning with the month of January, 1956, and during each subsequent month through June, 1956, you will manufacture and deliver to our order 500 Realist B cameras and no Realist A cameras. It is agreed that the David White Company will pay you for each month of this period an amount equal to 10.2% of the amount of the deficiency between the total billing value of the scheduled 500 B cameras ($11,500) and $24,500, the billing value of the monthly delivery quantities set forth in our formal contract.

"You have agreed further that, during this six months' period you will, upon one full calendar month's notice, increase monthly deliveries up to the minimum delivery stated in our original agreement. In the event that monthly quantities are so increased, the payment specified in the next preceding paragraph is to be adjusted to equal 10.2% of the deficiency between actual billing value of deliveries in the month and $24,500. : . .

"The remaining arrangements of the contract re the delivery of 35-mm. cameras of May 10th, 1955, including the supplemental agreement to remain in force—unchanged."

It should be emphasized that this was a temporary agreement for six months ending June, 1956, and it had nothing whatsoever to do with the period after May 1, 1957. The minimum billing figure of $24,500 is derived directly from paragraph 2 of the basic agreement which calls for minimum delivery of 1,000 A's and 500 B's at the prices set forth in paragraph 3 of the agreement.

*Third Amendment.* A final change was made on January 1, 1956, and it replaced paragraph 2 to read under paragraph 2 (a) and 2 (b) exactly as under the stereo contract changes and the agreement provided that the parts of the

August 26, 1955, agreement regarding the period from January, 1956, and after, were "deleted and canceled." In substance, subparagraph 2 (a) covered cameras to be delivered from January, 1956, through April, 1957, and subparagraph 2 (b) covered the period after May 1, 1957. There were no other changes. The agreement was not terminated.

Plaintiff sued for his loss of profits totaling $73,500 due to defendant's not taking required cameras in the period from May 1, 1957, through December 31, 1958.

C. *Was there a breach of contract as to quantities of each camera defendant was obligated to purchase?* The trial judge ruled that paragraph 2 (b) was controlling in each case on the purchase obligation during the period from May 1, 1957, through December 31, 1958, and that there was no obligation on the part of the defendant to purchase any minimum quantity of cameras during that period. We agree.

In essence all of the obligations on the part of the defendant to purchase cameras from the plaintiff through April 30, 1957, were discharged and compromised. As to the period after May 1, 1957, the trial court held:

"In the course of trial evidence was received bearing upon these contracts, and testimony was received relative to the subsequent agreements by the parties, but this evidence was insufficient to alter the court's opinion reached on the motion for summary judgment that the original contracts were so modified as to relieve the defendant from all commitments for cameras subsequent to May 1, 1957 (see (b) of Article I of Exhibits 2 and 7). Plaintiff failed to meet the burden of proving by a preponderance of the credible evidence, to a reasonable certainty, that the defendant had breached the contract with respect to the number of cameras of either type which it was required to purchase from the plaintiff."

The crucial point on the question of whether there was a breach of contract is the effect of subparagraph 2 (b) in each contract.

The record shows that prior to January 1, 1957, there was much concern on the part of the defendant as to the quality of the cameras. There was much correspondence between the parties on this problem and there was a great deal of testimony to the same effect at the trial. There were complaints that the cameras were malfunctioning. Of 28,545 cameras delivered to defendant, 753 were returned for repairs.

In January, 1957, negotiations were to be started between the parties under paragraph 2 (b) as to resumption of their business relationship. In essence, the paragraph contemplates that the parties will do business together in the future *on terms that are mutually agreeable.* As to this the trial court ruled:

"The plaintiff's contention that the defendant refused to negotiate in good faith in violation of the supplementary agreements is a conclusion. Fundamental to the law of contracts is the rule of certainty. Ordinarily an agreement to negotiate lacks a mutual understanding between the parties as to their respective rights and obligations. To the extent that the circumstances of the case at bar present an exception to this general rule is not completely clear from the proofs and pleadings submitted."

To be enforceable a contract must be definite and certain as to its basic terms and requirements. It must spell out the essential commitments and the obligations of each party with reasonable certainty. 12 Am. Jur., Contracts, pp. 554–557, sec. 64; Restatement, 1 Contracts, p. 40, sec. 32.

Thus it is stated:

"It is evident that courts can neither specifically enforce agreements nor award substantial damages for their breach when they are wanting in certainty. Damages cannot be measured for the breach of an obligation when the nature and extent of the obligation are unknown, being neither certain nor capable of being made certain." 12 Am. Jur., Contracts, p. 555, sec. 64.

Wisconsin law agrees.[8]

Under each of the contracts here there is, as defendant contends, "complete uncertainty as to the quantity, if any, to be ordered and delivered on and after May 1, 1957, for which reason alone the plaintiff's action must fall."

In *Hoffmann v. Pfingsten* (1951), 260 Wis. 160, 50 N. W. (2d) 369, our court held that a contract was amended so that the quantity of material to be covered by the contract was made so uncertain as to bring about no enforceable obligation.

The amended paragraph 2 (b) also leaves an uncertain identification of the cameras since it clearly recognizes that their identification is to be the subject of negotiation from among those that plaintiff produces at the later date, which cameras would satisfy certain competitive requirements. Thus there was uncertainty as to subject matter and this makes the contract unenforceable.[9]

The price was also uncertain.[10] Thus the plaintiff and defendant are left with an understanding and intent to reach an agreement in the future. This is not enforceable.[11]

But plaintiff contends that the provisions of paragraph 2 (b) are a legal nullity and therefore of no effect. The trial

[8] *Batavian Nat. Bank v. S & H, Inc.* (1958), 3 Wis. (2d) 565, 89 N. W. (2d) 309; *Petersen v. Pilgrim Village* (1950), 256 Wis. 621, 42 N. W. (2d) 273; *Ratcliff v. Aspros* (1948), 254 Wis. 126, 129, 35 N. W. (2d) 217; *Machesky v. Milwaukee* (1934), 214 Wis. 411, 253 N. W. 169; *Factor v. Peabody Tailoring System* (1922), 177 Wis. 238, 187 N. W. 984; *Strohn v. Hartford Fire Ins. Co.* (1875), 37 Wis. 625.

[9] See *Factor v. Peabody Tailoring System, supra; Oakland Motor Car Co. v. Indiana Automobile Co.* (7th Cir. 1912), 201 Fed. 499; *Wheaton v. Cadillac Automobile Co.* (1906), 143 Mich. 21, 106 N. W. 399.

[10] See *Petersen v. Pilgrim Village, supra; Machesky v. Milwaukee, supra.* "An agreement leaving the price for future determination is not binding." 12 Am. Jur., Contracts, p. 561, sec. 70.

[11] See *Batavian Nat. Bank v. S & H, Inc., supra; Ratcliff v. Aspros, supra;* also 12 Am. Jur., Contracts, p. 521, sec. 24.

court did not so hold and we are of the opinion that although paragraph 2 (b) did not create an enforceable obligation on the part of the defendant as to the quantities to be purchased from the plaintiff, the provisions of paragraph 2 did: (1) Resolve the disputes between the parties as to quality and plaintiff's repair costs; (2) relieve the plaintiff from making and the defendant from taking deliveries beyond specified quantities; and (3) make new provisions for deliveries after May 1, 1957. The supplemental agreements also expressly continued the basic contracts.

Plaintiff also contends that a duty arose on the part of the defendant under quasi contract due to the retention by the defendant of benefits on the exclusive United States market and that this constituted an election to continue the contract and its obligations. Essentially, plaintiff's argument is that the defendant, by requesting and accepting plaintiff's performance (during the period from January 12, 1956, through December 31, 1958) whereby the plaintiff held off on any sales within the United States in recognition of giving the defendant an exclusive market, the defendant thereby retained the benefits of the plaintiff's loss each year of over 30,000 sales of cameras in the United States. But the original agreement contained the terms actually foreclosing the plaintiff from the United States market. Defendant's letter of January 12, 1956, only restated the terms of the existing contract restrictions on plaintiff's sales in the United States.

We therefore conclude that there was no breach by the defendant of the quantity-purchase provisions of either contract.

D. *Did defendant breach any agreement not to make sales outside the United States?* The parties agree that the defendant sold 122 cameras outside the United States and its territories. Plaintiff claims that this was a breach of contract. Both contracts contained the identical provision:

"1. *Scope.* Witt hereby grants to White the exclusive right to sell and distribute Cameras A and B in the territory defined as the United States of America and all of its territories and possessions. Witt undertakes that it will not supply said cameras to any other person, corporation, or association for sale or distribution in the above-defined territory."

The trial court properly declared no breach and reasoned:

"The plaintiff contends that this provision conclusively infers that the defendant is denied the right to sell anywhere but in the territory specified. The failure of the contract specifically to prohibit the defendant from selling the cameras outside of the United States of America and all its territories and possessions more strongly implies that the defendant could sell in other places but would not enjoy an exclusive right. The maxim, 'That which is not prohibited is permitted,' is appropriate in interpreting this provision. Where a right to sell exists, specific language must be employed to limit that right. The words used conferred to White a monopoly in the United States and all its territories and possessions. Its privilege to compete in the open market in free competition elsewhere was not restricted. Williston on Contracts, V ed., sec. 1636, states that language in contracts providing for restraints of trade should be strictly construed."

E. *Damages.* From the above discussion it is concluded that since there was no breach of contract in any of the respects asserted by plaintiff, therefore there is no need to consider any questions on the damages owing to the plaintiff.

3. *Was plaintiff denied a fair trial because he was denied a fair chance to brief and to argue orally his motion for judgment and present his cause to the court?* There is no merit in plaintiff's claim that he was denied a fair trial because of insufficient opportunity to submit briefs and to give oral argument. From a close reading of the record it is obvious that the plaintiff had abundant opportunity to argue his cause. During the trial he was permitted time and time

again to argue his motions, offers of proof, and questions of witnesses in open court as well as in chambers. After the trial he was again given full opportunity to present his arguments to the court. There was no abuse of discretion by the trial court in either respect and we must conclude that the plaintiff was accorded a full and fair trial.

4. *Was the trial court correct in dismissing defendant's counterclaim on its merits without costs but with a right in defendant to reassert it in any remand, rehearing, or retrial of the merits of the case and in any court whatsoever?* The trial court dismissed the defendant's counterclaim on its merits and stated that said counterclaim may not be the basis of an independent action by this defendant against this plaintiff. Since this was a judgment adverse to the defendant, only he, therefore, may appeal this. Since the defendant did not appeal it, the trial court's determination of the dismissal of the defendant's counterclaim is not before this court.

Furthermore, because our decision results in affirming the lower court's judgment dismissing plaintiff's complaint on the merits, there is no further reason for considering this part of the judgment here.

5. *Was there error in the trial court's allowing defendant costs and attorney's fees of $5,000?* We conclude that it was error for the trial court to award $5,000 attorney's fees and costs to the defendant. The statutes that govern awarding costs, secs. 271.035 and 271.04, Stats. 1959, provide only that an award can be made to a prevailing party but not to exceed the statutory limit, which in this case would be $100.[12]

---

[12] Sec. 271.035 provides: "COSTS UPON COUNTERCLAIMS AND CROSS COMPLAINTS. (1) Except as otherwise provided in this section, costs shall be allowed on counterclaims and cross complaints as if separate actions had been brought thereon.

"(2) When the causes of action stated in the complaint and counterclaim and cross complaint arose out of the same transaction or occurrence, costs in favor of the successful party upon the com-

Defendant contends that the parties stipulated to an award of reasonable attorney's fees, and that the $5,000 awarded by the trial court is the sum stipulated to, is reasonable even if determined by the trial court without stipulation of the parties, and was properly awarded to the defendant as "the prevailing party" and as per the agreement of the parties in their contracts that in case of legal dispute the prevailing party would be entitled to reasonable attorney's fees.

If the parties agreed to the award of attorney's fees we would have no difficulty affirming that part of the judgment. But they did not. All the plaintiff stipulated to was that he would stipulate on the fee "within three days." He did not. The plaintiff and defendant also agreed that in the 35-mm. camera contract the parties agreed: "In the event of any suit, the losing party shall pay all costs of litigation, including the attorneys' fees of the other party." (Paragraph 15 in 35-mm. contract of May 10, 1954.) The other contract contained no such provision.

Therefore, we are in a position where there is no stipulation in court on fees and no agreement in all of the contracts covering that subject.

plaint and counterclaim and cross complaint so arising shall be in the discretion of the court.

"(3) Costs recovered by opposing parties shall be offset."

Sec. 271.04 provides: "ITEMS OF COSTS. When allowed costs shall be as follows: (1) *Fees.* (a) When the amount recovered or the value of the property involved is one thousand dollars or over, the costs (exclusive of disbursements) shall be one hundred dollars; when it is less than one thousand dollars and is five hundred dollars or over, fifty dollars; when it is less than five hundred dollars and is two hundred dollars or over, twenty-five dollars; and when it is less than two hundred dollars, fifteen dollars.

"(b) When no money judgment is demanded and no specific property is involved, or where it is not practical to ascertain the money value of the rights involved, the costs under paragraph (a) shall be fixed by the court, but shall not be less than fifteen dollars nor more than one hundred dollars."

In the end the trial judge could allow reasonable attorney's fees to the prevailing party. But where the complaint has been dismissed on its merits and a counterclaim for $500,000 has also been dismissed on its merits, there is no "prevailing party" and each party should pay his own costs and attorney's fees.

The judgment should be modified to eliminate that part allowing costs and the $5,000 attorney's fees to the defendant.

Both parties agree that the costs to be allowed to the defendant on the denial of plaintiff's motion to vacate the judgment should be $10 and not $25.

*By the Court.*—Judgment modified to provide that plaintiff is proper party plaintiff and to eliminate award of costs and $5,000 attorney's fees to defendant; as so modified, the judgment is affirmed. Order denying motion to vacate judgment is modified to provide for $10 costs and, as so modified, is affirmed. Costs on this appeal awarded to defendant and defendant allowed to tax costs on brief for pages in excess of 50.