Anthony CHIRICHILLO, Plaintiff,

v.

Robert PRASSER, Defendant.

No. 97–C–0814.

United States District Court,
E.D. Wisconsin.

Dec. 4, 1998.

Lee W. Shelly, Dominic H. Frinzi, Milwaukee, WI, for Plaintiff.

Kim M. Peterson, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

### I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Anthony Chirichillo makes two allegations in this lawsuit: (1) that he was a co-inventor of an invention patented by defendant Robert Prasser and should therefore be named on the patent as a co-inventor, and (2) that Prasser agreed to transfer to Chirichillo stock in the corporation that Prasser established to market the invention, but that Prasser breached this agreement. Jurisdiction is based on 35 U.S.C. § 256, which authorizes federal courts to order the Commissioner of Patents to correctly identify the inventors of a patented invention and on diversity of citizenship. Plaintiff and defendant are citizens of New Jersey and Wisconsin, respectively. Before me now is defendant's motion for summary judgment.

In 1991 Prasser owned a restaurant in Wisconsin where he did much of the cooking. He observed that heat generated by the stoves in the kitchen was released through hoods over the stoves to the air outside. He conceived of the idea of a combination cook stove fluid heater and grease filter, which would capture the thermal energy created by the stove in a fluid circulating throughout the filter and also filter grease. The fluid could be utilized to heat water or air. The idea was to use the heat generated by the stoves in a productive way rather than to lose it to the outside. Prasser worked on the implementation of this idea for the next six months in Wisconsin. In June 1992 he relocated to Colorado where he continued to work on the idea. By February 1993 he developed a prototype of the invention.

Plaintiff Chirichillo is a retired plumber who first met Prasser in August 1993 in Colorado, where plaintiff was visiting his son. Prasser showed the prototype of his invention to Chirichillo. Chirichillo told Prasser that Prasser's creation was a "wonderful invention," but that it needed improvements and had to be made safer. Chirichillo suggested a number of improvements, including copper tubing and various safety valves.

In September 1993 Prasser arranged a meeting regarding the invention with representatives of Modine Manufacturing Company in Racine, Wisconsin. Chirichillo accompanied Prasser to this meeting. Modine was interested in the invention, and in late 1993 Modine developed an improved prototype. In about February 1994 the prototype developed by Modine was installed in a restaurant in Colorado. Subsequently, Modine further refined the product, and the new prototype was installed in a restaurant in Florida.

In October 1993 Prasser filed an application for a patent, and on October 10, 1995, the United States Patent Office issued a patent on the invention to him. In late 1993 or early 1994 Prasser created a corporation, known as Hydro–Hoods, for the purpose of marketing the invention. Prasser initially owned 84% of the stock of this corporation. In 1993 Chirichillo provided financial assistance to Prasser amounting to about $10,000 for the purpose of helping Prasser develop the invention. Chirichillo did not give the money directly to Prasser but rather to his son, Patrick Chirichillo, who lived in Colorado and who passed the money on to Prasser.

In February 1994 Prasser discussed with Patrick Chirichillo an arrangement by which Prasser would give Anthony Chirichillo fifteen shares of Prasser's Hydro–Hood stock. At the time Prasser did not discuss this directly with Anthony Chirichillo, but Patrick advised Anthony of his discussions with Prasser. The parties dispute whether or not an agreement was reached obliging Prasser to transfer stock to Anthony and on the content of any possible agreement. Both parties agree that, if an agreement was reached, it was an oral agreement. The positions of the parties concerning the alleged agreement will be discussed subsequently in greater detail.

## II. SUMMARY JUDGMENT STANDARD AND APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

A "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a properly supported motion for summary judgment, the opposing party must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in their favor. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and makes summary judgment appropriate. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

■ A party seeking to be declared a co-inventor of a patented invention must prove co-inventorship by "clear and convincing proof." *Ethicon v. U.S. Surgical,* 135 F.3d 1456, 1461 (Fed.Cir.1998). This standard of proof on the invalidity of a patent must be considered when evaluating the sufficiency of the evidence on a motion for summary judgment. *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1189 (Fed.Cir.1996). "The heightened standard of clear and convincing evidence, which would be party's burden at trial, is to be considered when evaluating sufficiency of evidence on motion for summary judgment." *Id.*

### B. Applicable Law

■ This case presents two issues: whether plaintiff is entitled to the status of a co-inventor, and whether plaintiff and defendant entered into an enforceable contract. These issues are governed by different bodies of law. The issue of co-inventorship involves a question of patent law. Since October 1982 the Federal Circuit is the appellate court with jurisdiction over patent law issues. 28 U.S.C. § 1295. Prior to October 1982 the Seventh Circuit had such jurisdiction. Thus, I am bound by Seventh Circuit decisions before 1982 and Federal Circuit decisions thereafter.

■ Jurisdiction in this case is based both on diversity of citizenship and on the existence of a federal question. In either case, issues arising out of the breach of contract claim are governed by state law. In diversity cases federal courts apply state substantive law. *See Erie R.R.Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In federal question cases federal courts apply state substantive law to supplemental state law claims. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The states whose law is potentially applicable to the contract issues are Wisconsin, the forum state, and Colorado, the state where the contract was allegedly entered into. Where the law of two states is essentially the same, I apply the law of the forum state. *Railway Express Agency v. Super Scale Models, Ltd.,* 934 F.2d 135 (7th Cir.1991). The common law of contracts as well as the wording of the statute of frauds, which is relevant to oral contracts, is substantially the same in Wisconsin and Colorado.[1] There-

---

1. Colorado repealed that provision of its statute of frauds relating to the sale of securities effective July 1, 1996. The activity in the case at bar, however, occurred before that date. Under Colorado law statutes are presumed to operate pro-

fore, I will apply Wisconsin law to issues arising out of the breach of contract claim.

## III. DISCUSSION

### A. Co–Inventorship

 In order to prove that he is a co-inventor plaintiff must overcome a presumption that the inventor named on the patent is the true and only inventor. *See Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed.Cir.1997). To overcome this presumption plaintiff must show that he contributed to the conception of the invention. *Burroughs Wellcome Co. v. Barr Lab, Inc.,* 40 F.3d 1223, 1227–28 (Fed.Cir.1994). Conception is the critical factor in determining whether someone is entitled to the status of inventor. Conception is the formation in the mind of the inventor of a definite and permanent idea of the invention. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed.Cir.1986). An idea is sufficiently definite and permanent when "only ordinary skill would be necessary to reduce the invention to practice without extensive research or experimentation." *Burroughs Wellcome,* 40 F.3d at 1228.

 A patented invention may be the work of two or more joint inventors. *See* 35 U.S.C. § 116. One does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention. *Ethicon,* 135 F.3d at 1460 (citing *Sewall v. Walters,* 21 F.3d 411, 415 (Fed.Cir.1994)); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir.1985) ("[a]n inventor may use the services, ideas and aid of others in the process of perfecting his invention without losing his right to a patent.") One who simply provides the inventor with well-known principles does not qualify as a joint inventor. *Ethicon,* 135 F.3d at 1460 (citing *Hess,* 106 F.3d at 981). One of ordinary skill in the art who simply reduced the inventor's idea to practice is not necessarily a joint inventor. *Ethicon,* 135 F.3d at 1460 (citing *Sewall,* 21 F.3d at 416).

 To show co-inventorship, the alleged co-inventor must prove his contribution to the conception of the claims by clear and convincing evidence. *Ethicon,* 135 F.3d at 1461 (citing *Hess,* 106 F.3d at 980). Moreover, the testimony of an alleged co-inventor with respect to the facts underlying his claim of co-inventorship cannot, standing alone, rise to the level of clear and convincing proof. *Ethicon,* 135 F.3d at 1461 (citing *Price v. Symsek,* 988 F.2d 1187, 1194 (Fed.Cir.1993), and *Hess,* 106 F.3d at 980). An alleged co-inventor is therefore required to supply evidence to corroborate his testimony. *Ethicon,* 135 F.3d at 1461 (citing *Price,* 988 F.2d at 1194).

 Applying the foregoing principles to Chirichillo's claim, it is clear that Chirichillo has failed to produce evidence which, evaluated in the light most favorable to him, could enable a reasonable fact-finder to conclude by a standard of clear and convincing evidence that his contributions to the invention were sufficient to entitle him to the status of a co-inventor. Most importantly, nothing in the record suggests that Chirichillo contributed to the conception of the invention. The idea of a combination cook stove fluid heater and grease filter which would capture thermal energy and filter grease was entirely Prasser's. Prasser conceived the invention based on his long experience working in kitchens in restaurants.

Moreover, nothing in the record suggests that Chirichillo knew about or was interested in the subject matter of the patent until Prasser showed him the prototype. Chirichillo's response, after seeing the prototype, was to characterize it as a "wonderful invention." In addition, the evidence in the record is that, before meeting Chirichillo, Prasser had sufficiently reduced his idea to practice to have installed a crude version of his filter in his own restaurant and produced a prototype of the invention.

Even if I assume that Chirichillo's suggestions made Prasser's prototype safer and more workable, these suggestions were not contributions to the *conception* of the invention. Chirichillo's own deposition makes clear that his suggestions do not rise to a level of contribution entitling him to the sta-

spectively. *Kirby v. Industrial Comm.,* 732 P.2d 1232 (Colo.App.1986). Thus, the amended stat-

ute has no bearing on the case.

tus of a co-inventor. Chirichillo testified as follows:

A. I said to Bob, the more tubes we can put into this unit the better the collector we are going to get out of it which is copper tubing.

Q. So you suggested copper tubing?

A. Copper tubing, yes.

Q. Can you tell me specifically what size?

A. What size?

Q. Yeah.

A. Figured on half inch.

Q. All right. Any other suggestions?

A. And I specified to Bob personally that the U-bends that connect from one tube to the other should be made at a K-tubing or better material be bent.

Q. Out of—

A. K-tubing. There's a line of plumbing that we use letters for the thickness of piping.

Q. Okay. Any other suggestions that you made at the time?

A. I says you need safety valves, you need quite a bit of stuff before this ever goes into any effect.

Q. Do you recall any other discussions that you had during this eight to ten day visit in Colorado about the invention that we have not already gone through?

A. Just about repeating ourselves again and again. That's about it.

(Pl.'s Dep. at 19–20.)

Chirichillo testified that he reiterated his suggested improvements at the Modine meeting.

Q. Did you discuss the invention or the product at all during this meeting at Modine with anyone there?

A. I discussed it with—I think there was four men and a lady there, and I discussed with them that we should make this here a heavier copper tubing and repeating myself with the U-bends, which is one of the elements in that unit to be extra heavy.

Q. Okay. The U-bends needed to be extra heavy?

A. Right.

Q. Anything else?

A. That's all I remember.

(Pl.'s Dep. at 26.)

Chirichillo reinforced his testimony as to the somewhat limited nature of his own contribution later in his deposition:

A. Bob showed me what was only a couple of pieces of a pipe with elbows on it and little pieces of pipe in between. The idea was there.

Q. The idea was there, and you tried to make it work a little better?

A. I improved it better than what it was.

(Pl.'s Dep. at 21.)

Further, Chirichillo was not sure whether his suggestions were actually incorporated into the Modine-made prototype.

Q. So do you have any knowledge of whether your suggestions of more tubes or U-bends or safety valves were actually implemented in the invention or being used currently?

A. I think a year or so after that we had went to Modine here in Milwaukee, and we sat with four or five different engineers. And I expressed what had to be done.

(Pl.'s Dep. at 22–23.)

The foregoing testimony indicates that, while Chirichillo may have contributed to the invention by making it safer and more workable, his efforts fall into the category of assistance subsequent to conception. If conception is the touchstone of invention, *Burroughs*, 40 F.3d at 1227–28, Chirichillo was not an inventor. Prasser was entitled to use the ideas and aid of Chirichillo without losing his right to a patent. *Shatterproof Glass Corp.*, 758 F.2d at 624. Chirichillo provided Prasser with certain insights based on his experience as a plumber, but this contribution does not amount to that of a co-inventor. *Hess*, 106 F.3d at 981.

■ Prasser created a prototype of the invention before meeting Chirichillo. Thus, it cannot be said that without Chirichillo the invention was not reduced to practice. Chirichillo's suggestions may have moved along the process of making the prototype commercially feasible, but an invention need not be at a commercially satisfactory phase of development in order for conception to be com-

plete. *Modine Mfg. Co. v. Allen Group, Inc.,* 8 U.S.P.Q.2d 1622, 1625, 1988 WL 281562 (N.D.Cal.1988).

Chirichillo cites *Mueller Brass Co. v. Reading Indus., Inc.,* 352 F.Supp. 1357, 1372 (E.D.Pa.1972), in support of a relatively broad definition of co-inventorship. The *Mueller* court stated that "one must be able to say that without his contribution to the final conception it would have been less—less efficient, less simple, less economical, less something of benefit." For our purposes, however, the critical phrase in this statement is "contribution to the final conception." If Chirichillo did not contribute to the conception, his assistance in improving the invention does not make him a co-inventor.

Chirichillo faces another problem in resisting the motion for summary judgment on the issue of co-inventorship. To prove co-inventorship Chirichillo must corroborate his contributions to the invention by clear and convincing evidence. *Ethicon,* 135 F.3d at 1461 (citing *Hess,* 106 F.3d at 980). The testimony of Chirichillo cannot, standing alone, rise to the level of clear and convincing proof. *Ethicon,* at 1461 (citing *Price,* 988 F.2d at 1194 and *Hess,* 106 F.3d at 980). Corroboration usually requires some testimony by others as to the nature of the contributions or an embodiment of the invention in some clearly perceptible form, such as drawings or a model. *AMP, Inc. v. Fujitsu Microelectronics, Inc.,* 853 F.Supp. 808, 821 (M.D.Pa. 1994). Chirichillo has not demonstrated that any potentially corroborative evidence exists. He has acknowledged that there is no documentary corroborative evidence, and he has produced no affidavits other than his own. (*See* Def.'s Req. for Produc. Nos. 2, 3, 5–7.)

The only evidence in the record with respect to Chirichillo's role, other than his own testimony, is the statement of Craig Grohman, a Modine employee. His statement is not helpful to plaintiff's claim of co-inventorship. Grohman states:

3. I do not recall discussing the technical aspects [of the] invention with Mr. Chirichillo in any detail at this initial meeting.

4. I recall receiving a few phone calls from Mr. Chirichillo shortly after our first meeting, however, I do not recall discussing with Mr. Chirichillo the invention in any detail, and I do not recall discussing the technical aspects of the invention with Mr. Chirichillo.

5. I am not familiar with a "bleeder" valve on the invention, though there is a pressure relief valve which was added after the first installation in Colorado in 1994. I was the person who researched the particular relief valve which would best suit this invention, and I obtained the relief valve used on this project from the manufacturer. Mr. Chirichillo did not assist me in this regard, nor do I recall discussing the pressure relief valve with Mr. Chirichillo in any respect.

6. The coil used in this particular invention is a one row coil, and the number of tubes that you can use in this invention is limited. Since I have been involved with this project, the number of tubes used in the coils has not increased.

7. The invention does not utilize u-bends made of k-tubing. Rather, the invention utilizes refrigeration grade copper tubing, which is higher quality than k-tubing.

8. There are no check valves in the grease filter/heat exchanger itself, though I am informed and believe there are check valves in the grease filter/heat exchanger *system* which is installed in the individual restaurants.

(Grohman Aff. at 2.)

To defeat Prasser's motion for summary judgment, Chirichillo must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Considering the evidence in the light most favorable to Chirichillo, I find that Chirichillo has failed to present evidence from which a reasonable factfinder could determine by clear and convincing evidence that he is entitled to co-inventor status. Thus, defendant's motion for summary judgment on plaintiff's claim of co-inventorship will be granted.

**B. Breach of Contract**

Chirichillo's second claim against Prasser is for breach of contract. In his complaint Chirichillo alleges that he "contributed substantially to the design and development of the prototype of the patented product and

the defendant agreed to compensate plaintiff for his contributions and services by issuing to the plaintiff fifteen percent of the stock of a corporation which the defendant controlled." (Compl., Count 1, ¶ 2). Prasser responds that the contract Chirichillo relies on is an oral contract to sell securities and therefore barred by the statute of frauds. *See* Wis. Stat. § 408.319. The evidence presented, however, raises a more fundamental question, which is whether plaintiff has adduced sufficient evidence from which a reasonable jury could find that he and Prasser ever actually entered into a contract.

 Contracts are obligations imposed by bargain. *Goossen v. Estate of Standaert,* 189 Wis.2d 237, 246, 525 N.W.2d 314 (1994). The law protects the justifiable expectations of the contracting parties. *Merten v. Nathan,* 108 Wis.2d 205, 211, 321 N.W.2d 173 (1982). A contract is based on a mutual meeting of the minds as to terms, manifested by mutual assent. *Household Utils. v. Andrews Co.,* 71 Wis.2d 17, 28–29, 236 N.W.2d 663 (1976). A court should not import more into an oral contract than is expressed and agreed upon by the parties. *Roeske v. Diefenbach,* 75 Wis.2d 253, 260, 249 N.W.2d 555 (1977). To be enforceable, the contract must express the essential commitment and obligations of each party with reasonable certainty. *Witt v. Realist, Inc.,* 18 Wis.2d 282, 297, 118 N.W.2d 85 (1962).

 To determine whether there was a contract between Chirichillo and Prasser I apply the foregoing standards to the evidence before me. Chirichillo asserts that initially the alleged agreement was an "implied" contract. Plaintiff alleges that "Chirichillo's financial support of Prasser and his technical contributions to the grease filter were made under an implied agreement for compensation." (Pl.'s PFOF ¶ 6.) Chirichillo cites his own deposition as the basis for this contention. The portion of the deposition on which he relies, however, states as follows:

Q. What was the purpose of the meeting? Why were you going over there?

A. That's when he showed me what he had made.

Q. And was that the purpose of the meeting as well?

A. Well, the purpose of the meeting for that and plus money.

Q. What do you mean by money?

A. That he needed to invent what he was doing.

Q. He was looking for investments?

A. Right.

Q. And was he—was it your understanding at that meeting that he was looking to you to invest in this invention?

A. Well, I never—He never discussed this with us. I took it upon myself, and he took it on his own like that. We never discussed it, the invention or nothing. He said he wanted to patent this item and get it out. That's about it.

(Pl.'s Dept. at 12.)

The foregoing colloquy clearly is not a basis for concluding that there was an implied contract between Chirichillo and Prasser, creating a duty on Prasser to compensate Chirichillo.

Elsewhere in his deposition Chirichillo's testimony undermines his allegation that a contract existed. In fact, Chirichillo made clear that his support of Prasser's efforts was *not* rendered pursuant to a contract. He testified:

Q. Had you just—Why did you send him money, Bob Prasser? Why were you giving him money?

A. Because he was working on to get this thing developed.

Q. And what was your understanding? Were you getting something in return?

A. Honestly, we never discussed nothing between he and myself. We never discussed one item there.

Q. So you were giving him money to get the invention going, and that's about as far as it got?

A. That's all it was.

(Pl.'s Dep. at 25.)

In his proposed findings plaintiff asserts that "the implied agreement for compensation was later made explicit by defendant" and defendant "agreed to give the plaintiff fifteen (15) per cent of Hydro–Hood Corporation, Inc." (Pl.'s PFOF ¶¶ 7, 8.) Chirichillo's deposition testimony on this point is as follows:

Q. Who made this promise to you?

A. This promise was made to my son.

Q. By whom?

A. By Bob Prasser.

 * * * * * *

Q. Did Bob Prasser ever directly tell you that you would be receiving 15 shares of Hydro–Hoods stock?

A. I say a period of time has past. Exact months I won't remember. And I questioned Bob.

Q. About what?

A. When will he give me the stocks. I said, you promised 15 shares, That's correct he says. I says when are you going to give them to me? He says, Friday I will mail them out to you.

Q. Okay, Where did this conversation take place?

A. This conversation took place in I think it was Patrick's house.

Q. In Colorado?

A. Right, In Avon, Colorado.

Q. Do you recall when?

A. No.

Q. Was it prior to your meeting with Modine, that very first meeting?

A. No, after Modine.

Q. Was it after the installation at Friday's?

A. Yes, after that also. Not Friday's. At the Gasthaus.

Q. So after the installation at the Gasthaus but before the installation at Friday's?

A. I couldn't say for sure. I don't want to answer that.

Q. Was this promise made to you after you had made a claim that you were a joint inventor on the patent?

A. No. No.

Q. All right. Can you tell me why—what was your understanding of why you were promised this stock? Why were you getting 15 shares of stock?

A. Because I helped him out financially and on the unit.

Q. And is that the approximate $10,000 that we discussed earlier?

A. That was the financial end of it.

(Pl.s Dep. pp. 59, 60–61.)

Taking all of Chirichillo's testimony and construing it in the light most favorable to plaintiff, no reasonable factfinder could conclude that it is a sufficient basis on which to infer the existence of a contract with Prasser. At the time he helped Prasser, Chirichillo asked for nothing, and Prasser promised him nothing in return. Prasser's promise was made in February 1994, nearly six months after Chirichillo helped him. Prasser's promise was not even made to Chirichillo but to Chirichillo's son.

There is *no evidence in the record* suggesting that Prasser and Chirichillo ever struck a bargain. While Prasser may well have told Chirichillo's son that he would transfer stock to Chirichillo, Prasser's statement was not made as the result of a contractual obligation to Chirichillo. Prasser's promise may have been compelled by his gratitude to and affection for Chirichillo, but it was not made because he and Chirichillo had ever reached or even discussed a mutual agreement. Rather, Prasser's statement was voluntary and gratuitous. Based on the entire record in this case, a reasonable jury could not conclude that Chirichillo and Prasser ever entered into a contract with each other.

### 1. Statute of frauds

Prasser argues that even if he and Chirichillo entered into an oral contract, the statute of frauds bars enforcement of the contract. The statute of frauds provides in relevant part that an oral contract for the sale of securities is unenforceable unless "the party against whom enforcement is sought admits in his or her pleading testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price." Wis. Stat. § 408.319(4). Chirichillo contends that the contract is enforceable because Prasser admitted its existence. He relies on Prasser's deposition testimony and on a transcript of a telephone conversation between Prasser and Chirichillo's son-in-law, Don Casement, who secretly recorded the conversation.[2]

---

**2.** The transcript of the taped conversation between Prasser and Casement does not appear to

satisfy the requirements for an admission provided in Wis. Stat. § 408.319(4) because it is not an

In his deposition Prasser testified as follows:

Q. Did you ever discuss with Patrick Chirichillo the transfer of shares of Hydro Hoods to Anthony Chirichillo?

A. Yes.

Q. And when was the first time?

A. Well, probably the first day I met Patrick Chirichillo or shortly thereafter.

Q. What was the discussion?

A. Patrick was going to completely fund through his family and himself Hydro Hoods Corporation in exchange for half of the ownership percentage I had above 51 percent. At that particular time had Patrick fulfilled his funding obligation he would have received 15 shares because at that particular instance there were 30 in excess of 51 percent.

(Def.'s Dep. at 44.)

■ Prasser's testimony is that his agreement to transfer stock to Chirichillo was contingent on Chirichillo's fully funding the corporation established to promote the invention, a contingency which was never fulfilled. This testimony is not an admission that Prasser contracted to transfer stock to Chirichillo in return for Chirichillo's contributions to the development of the invention. Thus, a reasonable factfinder could not find that Prasser admitted the existence of a contract of sale as required by the § 408.319(4) exception. Therefore, even if there was an oral contract, the contract is unenforceable based on the statute of frauds.

■ In his Proposed Conclusions of Law, plaintiff asserts that there was substantial performance of the implied agreement between Chirichillo and Prasser. Plaintiff may be advancing the doctrine of part performance which provides that, notwithstanding the statute of frauds, an oral contract will be enforced if there has been such substantial performance that to hold it invalid would work a fraud or hardship. *Toulon v. Nagle,* 67 Wis.2d 233, 226 N.W.2d 480 (1975). Under the part performance doctrine, however, only those acts performed after the creation

of the oral contract may be considered in determining whether there has been part performance, and those acts must be solely and obviously referable to the contract. *In re Matter of Lade's Estate,* 82 Wis.2d 80, 86, 260 N.W.2d 665 (1978). The part performance doctrine is not a substitute for proof of the terms of the alleged contract but is a doctrine closely resembling estoppel, designed in part to prevent an injustice when the person, by his performance, has changed his position to his own detriment to the extent that an injustice would be done by permitting an invocation of the statute of frauds. *Nagle,* 67 Wis.2d at 233, 226 N.W.2d 480.

■ Chirichillo's conduct does not come within the part performance doctrine. First, according to his own testimony, Chirichillo's contributions to Prasser were made prior to the time when Chirichillo alleges that Prasser first agreed to give him any shares of stock (Pl.'s Dep. at 62). Second, according to Chirichillo's testimony, his contributions to Prasser were not referable to any contract with Prasser but were motivated by his wish to be helpful (Pl.'s Dep. at 25, 26).

Finally, Chirichillo cannot show that he changed his position to his own detriment so that injustice can be avoided only by enforcing the alleged oral contract. Prasser has submitted written agreements executed by Chirichillo's son indicating that Chirichillo's financial contribution of about $10,000 to Prasser was a loan which Prasser fully repaid. Thus, the record does not support a finding of detrimental reliance. In sum, no reasonable jury could find that there is sufficient evidence of part performance by Chirichillo to enforce an alleged oral contract, otherwise barred by the statute of frauds. Thus, defendant's motion for summary judgment on the breach of contract claim must also be granted.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment is

admission in a "pleading, testimony or otherwise in court." Moreover, defendant objects to my consideration of the transcript on the ground that it is unreliable. *See, e.g., McAlinney v. Marion Merrell Dow, Inc.,* 992 F.2d 839, 842 (8th

Cir.1993). However, the substance of Prasser's statements to Casement is similar to Prasser's deposition testimony, and thus, for the purpose of this motion, I will consider the transcript.

**1142**

GRANTED IN FULL, and this case is DISMISSED.