Timothy J. ZIOLKOWSKI, Plaintiff,

v.

CATERPILLAR INC., Defendant.

No. 91–C–827.

United States District Court,
E.D. Wisconsin.

Aug. 5, 1992.

Michael Jassak, Habush, Habush & Davis, Racine, Wis., for plaintiff.

Robert Schreiber, Lindner & Marsack, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

CURRAN, District Judge.

Timothy J. Ziolkowski commenced the above-captioned case against Caterpillar, Inc., his former employer, seeking compensatory damages, restitution and restoration of benefits on account of the breach of an oral employment agreement and for relief under the equitable doctrine of promissory estoppel. The Defendant removed this case from the Circuit Court of Milwaukee County (Wisconsin), then answered, denying liability. After the deadline for the taking of all discovery had passed, the Defendant moved for summary judgment on the grounds that there are no material facts in dispute and that it is entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56(c). This court has diversity jurisdiction over the subject matter of the claims raised in that Ziolkowski claims to be a citizen of Wisconsin;[1] Caterpillar is a Delaware corporation with its principal place of business in Illinois; and the amount in controversy exceeds $50,000.00. *See* 28 U.S.C. § 1332.

## I. FACTS

Pursuant to Local Rule 6, § 6.05, the Defendant has submitted a list of proposed findings of fact.[2] The Defendant states that:

1. Plaintiff is an adult resident of Wisconsin, residing at 6741 South 19th Street, Milwaukee, Wisconsin.

2. Defendant, Caterpillar, Inc., is a Delaware corporation with its principal place of business located at 100 NE Adams Street, Peoria, Illinois.

3. Plaintiff seeks an order requiring Defendant to pay all of Plaintiff's law school tuition, the value of all employee benefits including health, dental and life insurance for the period during which he is in law school, the value of employment with De-

---

1. The parties both allege that Ziolkowski was a citizen of Wisconsin when he filed his complaint on July 2, 1991, even though in April of 1991, Ziolkowski submitted a statement to the Illinois Department of Revenue in which he alleged that:

 I moved to Illinois on 1/27/90 with intentions of abandoning my domicile in Wisconsin; however, I temporarily moved back to Wisconsin on August 11, 1990 for the purpose of attending Marquette University Law School in Milwaukee, WI on a contractual educational leave-of-absence from my employer in Peoria, IL—Caterpillar Inc.

 The contract calls for me to return to my position in Peoria during the summers and at the completion of my degree for a minimum of three years. Therefore, my temporary stay in Wisconsin is not another change of domicile because I do intend on returning.

Ziolkowski filed a similar statement with the Wisconsin Department of Revenue. *See* Deposition of Timothy J. Ziolkowski at Exhibit 20. According to the record in this case, Ziolkowski's employment with Caterpillar was terminated on October 16, 1991.

2. The Plaintiff has objected to certain of the Defendant's findings as noted throughout this section.

fendant during periods of vacation from law school, the value of lost seniority and vacation leave associated with continued employment with Defendant and payment of the costs of obtaining and locating alternative employment.

4. Diversity jurisdiction exists between the parties and this matter is properly venued in the Eastern District of Wisconsin.[3]

5. Plaintiff applied for a position with Defendant on October 31, 1989, in response to its advertisement for electronic engineers. He was scheduled to graduate with an electrical engineering degree (B.S.E.E.) in December of that year and stated in his application that he was considering a master's degree in either engineering or business or a patent law degree for his future educational plans.

6. Plaintiff was hired by Defendant on January 29, 1990, as a College Graduate Trainee (CGT) at a starting salary of $2,850 per month. The CGT program is one year long and consists of a series of 6 to 8 week assignments in various of Defendant's departments.

7. Prior to any contact with Defendant, Plaintiff had an interest in attending law school and took the Law School Admissions Test (LSAT) on September 23, 1989. Two months subsequent to his employment with Defendant, he applied for admission to Marquette University Law School.

8. One of Plaintiff's CGT assignments was in Defendant's Patent Department from April 2, 1990, to May 18, 1990. William Thompson was the head of the Patent Department with Robert Muir being second in command. Thompson reported to Robert Thornton, Vice–President.

9. Upon receiving his acceptance from Marquette University Law School on April 30, 1990, Plaintiff spoke to Muir and Thompson requesting a leave of absence to go to law school. Thompson asked Plaintiff whether he would be interested in working in the Patent Department and pursuing his law degree part-time while continuing employment with the company; Plaintiff responded that he preferred to go to school right away. Thompson indicated to Plaintiff that he would need to get information regarding leaves of absence and discuss the situation with Thornton.

10. During a meeting with Muir on the evening of Memorial Day, 1990, Plaintiff reaffirmed his desire to go to law school immediately rather than the alternative of a longer law school program while remaining employed.

11. In mid-June, 1990, Muir informed Plaintiff that he had done everything that he could, but that his educational leave of absence request had been denied since he had less than a year's service. Plaintiff was made aware that Defendant's educational leave of absence program was not available to employees with less than one year's service.

12. Defendant's written educational leave of absence policy includes a requirement that an employee have a minimum of one year of continuous service with Defendant at the time the educational leave begins.

13. On or about June 22, 1990, Plaintiff drafted a personal letter to James Wogsland, Vice–Chairman of Caterpillar, Inc., requesting reconsideration of the decision to deny the leave of absence. At the same time, Muir suggested that Plaintiff delay sending the letter to Wogsland and allow the Patent Department to seek reconsideration of the decision on his behalf.

14. In July, 1990, Plaintiff told a co-worker, David Masterson, that he would be leaving his rented home in Peoria and agreed to sublease the residence to Masterson. On July 25, 1990, Masterson paid Plaintiff a deposit for this sublease.[4]

15. An opportunity for Plaintiff to meet personally with Wogsland to discuss his

---

**3.** The court notes that this is a legal conclusion, not a "fact."

**4.** *ZIOLKOWSKI'S RESPONSE:* It was not until two days before Ziolkowski left Peoria for Milwaukee that he had definitely decided he would be leaving his rented home in Peoria. Any conversations Ziolkowski had with his co-worker, David Masterson, about his home were "contingency plans" in the event Caterpillar did grant Ziolkowski's leave.

situation was scheduled for August 8, 1990. Prior to this meeting, on August 7, 1990, Wayne Zimmerman, Vice–President, Human Services Division, directed a memo to Wogsland summarizing the countervailing considerations pertaining to the requested leave and suggesting various conditions for such a leave of absence should Wogsland decide to support it.

16. Plaintiff met with Wogsland for ten minutes on Wednesday, August 8, 1990. Immediately after that meeting or the following day, Plaintiff drafted his summary of this meeting. Plaintiff described his conversation with Wogsland as follows:[5]

 a. Plaintiff gave Wogsland his June 12, 1990, letter and Wogsland read it.
 b. Wogsland asked Plaintiff whether he was willing to make a commitment to the Defendant and Plaintiff asked what kind of commitment. Wogsland said a commitment to work one year for Defendant for each year of school and Plaintiff stated he was willing to make such a commitment.
 c. Wogsland said that if Plaintiff did not fulfill the commitment to work for Defendant for three years following his graduation from law school, he would have to reimburse Defendant for medical coverage expenses incurred by Defendant on Plaintiff's behalf during his schooling.
 d. When Plaintiff asked Wogsland about tuition reimbursement for his schooling, Wogsland said he had not been made aware that that was part of the leave of absence request. Plaintiff stated that he had been talking with the Patent Department about tuition and Wogsland responded that, if that was the case, he would get it.
 e. At the conclusion of their meeting, Wogsland told Plaintiff that he had to meet with Wayne Zimmerman,

Vice–President, Human Services, to work out the details of a leave of absence.

17. The following subjects and issues pertaining to an educational leave of absence were not discussed during Plaintiff's meeting with Wogsland:

 a. The compensation level to be paid by Defendant to Plaintiff following his graduation from law school was not discussed.
 b. Plaintiff and Wogsland did not discuss what would happen regarding the parties' obligations if Defendant could not offer Plaintiff employment subsequent to his graduation from law school.
 c. They did not discuss summer employment opportunities for Plaintiff nor did they discuss what would happen if Defendant did not offer summer employment to Plaintiff. Also, there was no discussion regarding compensation levels for summer employment.
 d. Plaintiff and Wogsland did not discuss whether he would be granted three one-year leaves of absence subject to renewal versus one three year leave.
 e. The method for determining the amount of Plaintiff's potential medical expense reimbursement obligation was not discussed.
 f. They did not discuss procedures to be used for tuition reimbursement.

18. At the conclusion of his meeting with Wogsland on August 8, 1990, Plaintiff's understanding was that he would receive no tuition reimbursement until he came back to work for Defendant after his graduation from law school.

19. The oral educational leave of absence agreement being asserted by Plaintiff is based upon his August 8, 1990, con-

**5.** *ZIOLKOWSKI'S RESPONSE:* Ziolkowski estimated that his meeting with Wogsland lasted for "about maybe 10 minutes." Wogsland, however, was not sure how long the meeting lasted but he thought it was maybe 10 or 15 minutes but was certain that it wasn't over a half hour. Wogsland was aware of the tuition reimburse-

ment question, as this issue was addressed in Zimmerman's August 7, 1990 memo to Wogsland. Tuition reimbursement is obtained through Caterpillar's Educational Assistance Plan. Wogsland committed to support Ziolkowski in law school for three years.

versation with Wogsland and he acknowledges that conversation to constitute the full extent of the agreement. Plaintiff asserts that the alleged oral agreement was the basis for leaving his employment with Defendant on August 10, 1990, to go to law school in Milwaukee.

20. Pursuant to Wogsland's directive, Plaintiff contacted Zimmerman on August 9, 1990, to work out the provisions of an educational leave of absence. During this meeting, Zimmerman asked Plaintiff whether he understood that the leave of absence would have to be agreed to in writing and Plaintiff stated that he did. Plaintiff agreed with Zimmerman's statement that this written agreement would have to be signed by the parties.[6]

21. During Plaintiff's conversations with Zimmerman on August 9, 1990, there was some disagreement regarding certain terms of the leave of absence. There was confusion as to whether tuition reimbursement payment would be made year-by-year or only after graduation from law school. Zimmerman also mentioned Plaintiff's obligation to pay back tuition reimbursement if he did not stay for three years following graduation and Plaintiff disagreed on the grounds that Wogsland had not stated that. A difference of opinion also existed about whether Plaintiff's medical expense reimbursement obligation would be based upon health coverage premiums or actual costs incurred. On the afternoon of August 9, 1990, Plaintiff and Zimmerman reached a general understanding that tuition reimbursement would be year-by-year and that Plaintiff would have a repayment obligation in the event he did not return for three years after graduation.

22. At the conclusion of their discussions, Zimmerman told Plaintiff that Ted Johnson would be contacting Plaintiff for the purpose of drafting an agreement. Johnson is an attorney in Defendant's legal department who was responsible for drafting the written leave of absence agreement for Plaintiff.

23. Johnson called Plaintiff on Thursday, August 9, 1990, and asked Plaintiff to describe his understanding of the leave of absence provisions. Plaintiff did so and there was some disagreement over whether Plaintiff's potential health coverage reimbursement obligation was to be measured by actual expenses incurred or premium value. During this conversation, Plaintiff agreed to premium value reimbursement. Plaintiff asked Johnson when he could draft the document and Johnson stated he could during the following week.

24. Plaintiff left active employment with Defendant on Friday, August 10, 1990. He decided to leave that day, despite some concern over leaving without a signed agreement, because he had to "accommodate his living arrangements." Plaintiff's law school was scheduled to start with an orientation session twelve days later in Milwaukee, Wisconsin on August 22, 1992.

25. Plaintiff moved into his father's residence in Milwaukee, Wisconsin on August 11, 1990. His father had begun building an addition to his home in July, 1990, specifically for use by Plaintiff when he returned to law school in Milwaukee.[7]

26. On August 17, 1990, Johnson mailed a letter to Plaintiff specifically stating the "terms and conditions under which Caterpillar, Inc. will grant you a leave of absence" to attend law school at Marquette University Law School. Johnson specified that if its terms were agreeable to Plaintiff, he was to execute and return the original to Defendant.[8]

**6.** *ZIOLKOWSKI'S RESPONSE:* Ziolkowski agreed with Zimmerman that the agreement, *that had already been reached,* between himself and Wogsland would have to be put into writing.

**7.** *ZIOLKOWSKI'S RESPONSE:* Ziolkowski's father was building an addition on his home that Ziolkowski could use "if" Ziolkowski returned to Milwaukee to go to law school. If Ziolkowski did not return to Milwaukee, Ziolkowski's father was going to use the addition as a recreation room.

**8.** *ZIOLKOWSKI'S RESPONSE:* Johnson's letter to Ziolkowski dated August 7, 1990, states, *"If you agree that this letter accurately reflects the terms and conditions of your leave* and if you are agreeable thereto, please sign the original of this letter where indicated having your signature notarized and return the signed original to

27. Plaintiff's understanding of Johnson's August 17, 1990, proposal was that it would allow the Patent Department to discontinue his leave of absence, at its discretion, at the end of either the first or second year of law school. Plaintiff also understood that summer employment opportunities were at the discretion of Defendant.[9]

28. On September 6, 1990, Plaintiff executed the August 17, 1990, letter proposal received from Johnson. In executing the document, however, Plaintiff made a marginal note referencing an attachment in which he intended to "clarify" paragraph 5 of the letter. Plaintiff's "clarifications" were additions to Johnson's draft. The Plaintiff's referenced attachment, also dated September 6, 1990, states that he will have no reimbursement obligation for tuition, health and life insurance payments made by Defendant in the event that Defendant does not offer him employment in the Patent Department at a "competitive salary" or in the event that Defendant terminated his employment through no fault of his own during his three year term of employment.[10]

29. Johnson received Plaintiff's September 6, 1990, additions in an envelope postmarked September 18, 1990, some time subsequent to September 18th.

30. Prior to drafting his September 6, 1990, letter to Johnson, Plaintiff never used the term "competitive salary" in the negotiations concerning his leave of absence, nor had he ever discussed the salary he was to be paid upon graduation from law school.

31. Johnson responded to Plaintiff's September 6, 1990, letter by correspondence dated October 1, 1990. Johnson's response indicated that Plaintiff's exceptions to the repayment provisions were agreeable but stated that the phrase "competitive salary" would have to be defined as an offer "within the existing salary range of entry level attorneys in the Patent Department at the time you complete your legal education." Johnson asked that Plaintiff indicate his acceptance of this definition no later than October 10, 1990. Plaintiff understood that he could accept this October 1, 1990, letter by signing it and that the deal would then be complete.[11]

32. Plaintiff was generally aware that Defendant classified every position and that there was a salary range into which every classification fell.

33. Plaintiff responded to Johnson's October 1, 1990, correspondence with a letter back to Johnson dated October 6, 1990. In that response, Plaintiff stated that "we disagree on the interpretation of the term 'competitive salary.'" He continued by taking the following positions:

a. Defendant's salary range for entry level attorneys may not properly credit his prior experience and he should not be paid the same as an attorney with different experience;

b. He would not let his judgment be impaired by his desire to return and work for Caterpillar; and

c. The term "competitive salary" as he was using it meant "a fair salary which would closely match that of which I would receive in the marketplace."

34. Plaintiff never asked Johnson what this entry level patent attorney salary range was because it "didn't occur" to him to do so.

35. On October 16, 1990, Johnson wrote to Plaintiff acknowledging Plaintiff's failure to agree to the proposed terms and conditions for an educational leave of absence and terminating his employment.

us in the enclosed self-addressed, stamped envelope."

9. *ZIOLKOWSKI'S RESPONSE:* Ziolkowski was assured by Thompson and Muir that there was plenty of work for the summer and that there would be no question whether Ziolkowski would return for summer employment.

10. *ZIOLKOWSKI'S RESPONSE:* In his deposition, Ziolkowski repeatedly referred to his response to Johnson's letter of August 17, 1990 as a "clarification."

11. *ZIOLKOWSKI'S RESPONSE:* Ziolkowski believed "the deal" was complete at the conclusion of his meeting with Wogsland.

36. Subsequent to his receipt of Johnson's letter of October 16, 1990, Plaintiff telephoned and wrote to Johnson asking that Defendant's decision be reconsidered and requesting another opportunity to sign Johnson's October 1, 1990, letter as drafted. His letter to Johnson was dated October 23, 1990.

37. Johnson advised Plaintiff in a letter dated November 5, 1990, that his October 23, 1990, request had been reviewed by the appropriate Company representatives and that Defendant was unwilling to reconsider or reopen its decision.

38. Plaintiff never requested that Defendant allow him to return to employment in the College Graduate Trainee (CGT) program.
Brief, Proposed Findings of Fact and Appendix in Support of Defendant's Summary Judgment Motion at 2–13 (citations omitted).

The Plaintiff has proposed the following additional findings and the Defendant has responded as noted:

1. During Ziolkowski's interviews with Caterpillar, he was informed by Caterpillar personnel that Caterpillar had a very liberal educational leave program. Ziolkowski was also informed that Caterpillar encouraged people to go on educational leave. Jim Yee specifically told Ziolkowski during his interview about the patent department and that the patent department would train people in law school. Ziolkowski was told about two different programs. One program was a straight out leave of absence where the person would go to school, retain their [sic] benefits, receive tuition reimbursement and then return to work for the company. The other program involved the person working in the patent department

for a number of years and then going to law school while still working for the company from their [sic] home or a satellite office.

2. During Ziolkowski's interviews, he was also informed that the company encouraged employees to take educational leave within the first year of employment with the company. This allowed the employee to obtain additional education before they were permanently assigned within the company.

3. Caterpillar informs engineering graduates, such as Ziolkowski, about the various advanced degree options which Caterpillar offers, including educational leaves, during recruiting visits to campuses. Caterpillar has found the lure of educational leaves as a good recruiting tool.

4. A number of Caterpillar employees have been encouraged in the past to take educational leave while still in the one year college graduate training ("CGT") program.[12]

5. Ziolkowski's work in the patent department was "excellent."

6. The patent department was so impressed with Ziolkowski's work that they believed he would be a good candidate for the patent department's Legal Education Program. The Legal Education Program has the employee working for the company for a period of time and then going to law school part time while still working for the company.

7. The patent department pursued Ziolkowski with the idea of possibly going to law school under some sort of an arrangement.[13]

12. *DEFENDANT'S RESPONSE:* Based upon the evidence cited by Plaintiff in support of this proposal, the proposed finding is incomplete and therefore potentially misleading. The evidence cited by Plaintiff provides that, "[F]or the convenience of the company, a number of employees were encouraged in the past to take educational leave while still in the CGT program." Furthermore, the cited testimony included nothing to indicate that such situations involved employees leaving for three years of law school.

13. *DEFENDANT'S RESPONSE:* This proposed finding is inconsistent with the evidence Plaintiff cites in its support. The inaccuracy involves Plaintiff's usage of the phrase "under some sort of an arrangement." It is clear that both Muir and Thompson testified that they spoke to Plaintiff with the idea of participating in the Legal Education Program, not a leave of absence or "some sort of arrangement" as proposed by Plaintiff.

8. The patent department's Legal Education Program had no written guidelines.

9. Ziolkowski was informed by Muir that it would be more beneficial to the patent department if he went on leave in August 1990, as opposed to going through the Legal Education Program because the patent department already had other people scheduled to leave the company on the Legal Education Program.[14]

10. Ziolkowski was interested in the educational leave of absence because it would allow him to complete his school immediately. Ziolkowski was interested in starting a family and did not want to put off starting a family for the seven to eight years that it would have taken him to work in the patent department and then go to law school part time.

11. Although there was a general rule at Caterpillar that employees were required to have one year of service to qualify for educational leave, *there was an exception* to that rule if the employee obtained approval from the company's executive office.

12. While the status of Ziolkowski's educational leave was still being discussed, Ziolkowski had no intention to, nor ever told anyone, that he was going to go to law school regardless.[15]

13. Prior to Ziolkowski's meeting with Wogsland, Ziolkowski had a conversation with Thompson to the effect that Ziolkowski may be able to obtain insurance coverage through his wife if she obtained employment. Ziolkowski was hopeful that if

he could do that, it may help his chances of obtaining the leave.

14. Ziolkowski was led to believe that once Thornton had given his approval of the educational leave, the leave would be granted. It was only after the fact that Ziolkowski learned that Thornton had to take the leave request to Wogsland.

15. Muir suggested to Ziolkowski that he should write a letter to Wogsland seeking a reconsideration of the company's initial denial of the leave request. After Ziolkowski prepared the letter, Muir then told Ziolkowski not to send it. Muir wanted to make one more effort to obtain the leave.

16. Muir was surprised Ziolkowski was even able to obtain a meeting with Wogsland.

17. At the conclusion of his meeting with Wogsland (which took place in Wogsland's office), Ziolkowski believed he had an agreement with Caterpillar concerning his educational leave.[16]

18. Following his meeting with Wogsland, Ziolkowski informed Olson and Waters that he had reached an agreement with Wogsland concerning his educational leave of absence.

19. At the conclusion of his meeting with Ziolkowski, Wogsland believed that the "deal was done." The only thing Wogsland believed that was left to be done was to document the agreement that had already been reached. The documents that were to be put together were to be consistent with the agreement that had been

**14.** *DEFENDANT'S RESPONSE:* Defendant contests this proposal since Plaintiff's deposition testimony cited in its support does not state that Muir was referencing a leave of absence in August, 1990. Furthermore, the proposed finding is misleading since it is presented out of proper context. That context being that Plaintiff had previously told Muir that he was not interested in the department's Legal Education Program. Mr. Muir unsuccessfully tried to persuade Plaintiff to join the Legal Education Program.

**15.** *DEFENDANT'S RESPONSE:* The evidence cited by Plaintiff in support of this finding is insufficient to support the position that he never told "anyone" that he was going to law school regardless and is inconsistent with the position that he had "no intention" of doing so. At best, the evidence supports an argument that he nev-

er told Muir, Thompson or Thornton. The Muir testimony cited by Plaintiff includes the statement, "My impression was that Tim was going to law school and what we were trying to do was to help him get into a situation where he might have to leave."

**16.** *DEFENDANT'S RESPONSE:* The testimony cited by Plaintiff to establish his "belief" concerning the status of his leave of absence request, presents a somewhat different factual scenario than he proposes since it is clear that he knew an additional event had to take place to conclude a deal. His complete testimony as cited was, "when I walked out of that room, I had an agreement. I felt the agreement was there and that—that all that had to be done was that I called Zimmerman to work out the details . . ."

reached between Wogsland and Ziolkow-ski.[17]

20. Thompson and Muir were very pleased that Ziolkowski had been granted the leave.

21. It was Wogsland's understanding that he had agreed with Ziolkowski that Caterpillar would support Ziolkowski in law school for three years, and that Caterpillar would maintain Ziolkowski's medical expenses and reimburse his tuition. If Ziolkowski did not come back to work for Caterpillar, he would then reimburse Caterpillar.

22. Zimmerman characterized the agreement between Wogsland and Ziolkowski as containing "simple terms and conditions."[18]

23. On August 1, 1990, Ziolkowski's title at Caterpillar was changed from "college graduate trainee" to one of "patent analyst."[19]

24. On August 10, 1990, two days after his meeting with Wogsland, Ziolkowski had an exit interview with Olson and Waters to finalize his leave. Olson congratulated Ziolkowski on obtaining the leave. Olson then informed Ziolkowski that he had been transferred to the Patent Department and then to an educational leave as of that day. Olson also gave Ziolkowski additional medical and dental benefit forms and advised Ziolkowski how to submit claims. He also requested Ziolkowski's new address and telephone number at this meeting.[20]

25. The patent department was going to oversee Ziolkowski's leave.

26. Ziolkowski expressed a concern to Olson during his exit interview about leav-

---

**17.** [W]ith regard to Plaintiff's proposal number 19, he again asserts a fact that misleadingly ignores a probative portion of the witness's statement. In proposing that Wogsland believed the "deal was done," Plaintiff cites to the following Wogsland testimony, "He [Ziolkowski] said that he would come back and work for three years, and as far as I [Wogsland] was concerned, if he *worked out the details,* the deal was done. Plaintiff has not attempted to contradict the substance of those proposed findings.

Describing the outcome of his meeting with Plaintiff, in the testimony cited by Plaintiff, Wogsland again expressed the understanding that the deal was to be concluded with Zimmerman. He states, "And I didn't know about the details because I told him to work out the details with Wayne Zimmerman."

**18.** *DEFENDANT'S RESPONSE:* Again the Plaintiff's proposal misstates the evidence he cites in its support. Zimmerman did not characterize "the *agreement* between Wogsland and Ziolkowski as containing 'simple terms and conditions.'" In actuality, Zimmerman testified that, "we *offered* him very simple terms and conditions ..." On that very same page of his transcript, Zimmerman further stated that there were "meaningful negotiations" between the parties and that it became obvious that the parties weren't going to come to an agreement since, "He [Ziolkowski] was refusing to sign a very simple document relative to one issue."

**19.** *DEFENDANT'S RESPONSE:* It is true that Defendant's personnel records show Plaintiff to have been transferred from the CGT program to the Patent Department as of August 1, 1990. This was necessary because Plaintiff decided to leave on August 10, 1990, for law school and the

personnel records had to carry him in some status other than a CGT employee subsequent to that date. August 1st was used as the effective date pursuant to corporate policy which requires that such transfers be made effective on the first day of the month.

**20.** *DEFENDANT'S RESPONSE:* These proposed findings describe Plaintiff's meeting with William Olson and Mary Waters on August 10, 1992, the day he left the Defendant to go to law school in Milwaukee. Defendant contests these proposed findings, even though they are not material, in order that the Court have a more complete and accurate understanding of background facts. Mary Waters testified that during this meeting on August 10, 1992, Plaintiff was given a copy of the narrative on the second page of the Management Exempt Employee Profile and that it was read to him. She further testified that Olson specifically related to Plaintiff that a contract would be submitted to him for acceptance and that if he refused to sign it his leave would be terminated. Furthermore, Plaintiff did in fact testify as to why he left on August 10, 1990, prior to a contract being signed as follows:

"Q If you were concerned about leaving before the contract was signed, why did you? A Because I had responsibilities to go take care of if I was going to leave at all."
Finally, there are facts included in Plaintiff's Proposed Finding No. 24, which are not included in the testimony he offers as support. First, the testimony cited does not say the meeting was to "finalize his leave," and second, it contains no indication that Olson or anyone else requested Plaintiff's new address and telephone at this meeting.

ing before having the opportunity to sign the agreement Johnson was supposed to prepare. Ziolkowski, however, was told by Olson *not to worry about signing an agreement before he left* because the company "does agreements all the time" and that "you'll probably wind up sending it [i.e., the agreement] back and forth, who knows, five or ten times before you guys wind up agreeing to everything that is in it."

27. As of August 10, 1990, Ziolkowski's Employee Profile showed him as being on educational leave (i.e., "EDC").

28. After receiving Johnson's letter dated August 17, 1990, Ziolkowski called Johnson about a clarification to Johnson's letter concerning reimbursement in the event Caterpillar did not offer him employment after law school.

29. During the telephone conversation between Johnson and Ziolkowski on or about August 30, 1990, Johnson told Ziolkowski to clarify the letter of August 17, 1990, and send it back to him signed. Ziolkowski agreed and did just that.[21]

30. Attached to Ziolkowski's letter to Johnson dated September 6, 1990, was a signed and notarized copy of Johnson's August 17, 1990, letter.

31. Muir told Ziolkowski that he should pick one or two items that were most important to him to have clarified but that he should not try to renegotiate the whole agreement.[22]

32. Thompson agreed with Ziolkowski that Ziolkowski's concern over repayment in the event the company did not offer him a job at the conclusion of his law school was a valid point.

33. Zimmerman agreed that the questions raised by Ziolkowski regarding reimbursement were reasonable.

34. In the letter from Johnson to Ziolkowski dated October 1, 1990, Caterpillar agreed with Ziolkowski that if Caterpillar did not offer him full-time employment at the time of his graduation, Ziolkowski would not have to repay Caterpillar. Caterpillar also agreed that if Ziolkowski was terminated through no fault of his own during the course of his three year term of employment with Caterpillar following graduation from law school, he would not be obligated to repay Caterpillar.

35. The salary issue which was raised in the correspondence between Johnson and Ziolkowski was a minor detail which Ziolkowski did not place very much importance on.[23]

36. Ziolkowski was never warned or informed by anyone at Caterpillar that he would be fired if he did not sign all of the letters that Johnson was sending to him.[24]

37. Ziolkowski was never informed by Caterpillar that if he did not agree with

21. *DEFENDANT'S RESPONSE:* To the extent that this proposal characterizes Plaintiff's September 6, 1990, letter as a simple "clarification" of Johnson's August 17, 1990, draft, he presents argument not fact. In this September 6, 1990, letter, Plaintiff first introduces his demand for a "competitive salary" into the negotiations.

22. *DEFENDANT'S RESPONSE:* Defendant does not object to this proposed finding, however, wishes to note that the conversation being described by Muir included no explanation by Plaintiff that he had or was considering interjecting the competitive salary issue into the negotiations.

23. *DEFENDANT'S RESPONSE:* Plaintiff's assertion that he did not place much importance on the competitive salary issue is unequivocally contradicted by his own actions and is not supported by his own testimony. He interjected the issue into the negotiations subsequent to his conversations with Wogsland and Zimmerman and was adamant that he would not commit to returning to Caterpillar after law school unless it was agreed that he would be paid a salary which would "closely match that of which [he] would receive in the marketplace."

24. *DEFENDANT'S RESPONSE:* As conceded by Plaintiff, he was fully aware that he would be required to conclude a leave of absence agreement with Zimmerman and sign a contract with Defendant. Plaintiff was terminated by Defendant on October 16, 1990, because of his failure to agree to the proposed terms for an educational leave of absence. The termination letter expressly stated that, "We consider you to have quit the company to pursue further education." The Plaintiff never requested that Defendant allow him to return to employment in the College Graduate Trainee Program.

Johnson on the salary issue, he was going to be fired.

38. Ziolkowski was "stunned" by Caterpillar's decision to fire him.

39. After Ziolkowski was fired on October 16, 1990, he called Johnson and told him that the salary issue was not a big deal to him and that he would go ahead and sign the letter that had been sent to him.

40. Other than with Ziolkowski, Johnson has never been asked to prepare any type of written agreement concerning an educational leave.

41. A Caterpillar employee by the name of Steve Janda also started law school at Stanford in 1990. There was no written agreement between Janda and Caterpillar concerning Janda's educational leave.[25]

42. Following Ziolkowski's termination from Caterpillar in October 1990, the patent department has employees draft their own agreements concerning educational leave.[26]

43. According to Muir, Ziolkowski would have automatically been brought back for summer employment between semesters, whether or not there was enough work.

44. Caterpillar imposed a hiring freeze in 1990 which continues to date.

45. While employed at Caterpillar, and prior to leaving for law school, Ziolkowski lived in Peoria, IL.

46. Ziolkowski was making $34,200.00 as a college graduate trainee.

47. It was not until February of 1991 that Ziolkowski retained an attorney.

48. Johnson and Kenney have no idea what a first year Caterpillar patent attorney makes in salary.

49. Thompson never explained to Ziolkowski Caterpillar's salary range for first year patent attorneys.

Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at 3–10 (citations omitted).

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the moving party, in a properly supported motion, demonstrates that there is "no genuine issue of material fact," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986), and that it is entitled to judgment in its favor as a matter of law. *See* Federal Rule of Civil Procedure 56(c). Where, as here, the Defendant is attempting to demonstrate that the evidence in the record falls short of establishing an essential element of the Plaintiff's case, the Defendant need not produce evidence of its own because it is the Plaintiff who will bear the burden of proof at trial. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In responding to a properly supported motion, the Plaintiff must come forward with evidence of his own establishing each of the challenged elements of its case. This can be accomplished by tendering affidavits, depositions, and other materials which provide evidentiary support for each of the challenged elements of his claim. The nonmoving party cannot rest on the allegations of his complaint. *See* Federal Rule of Civil Procedure 56(e). But, because factual disputes may not be resolved on a motion for summary judgment, the Plaintiff need not offer all of the evidence tending to support his case, only enough

**25.** *DEFENDANT'S RESPONSE:* Since this proposed finding is incomplete, it appears likely to mislead. Plaintiff fails to point out to the Court that Mr. Janda was not a less than one year service employee such as Plaintiff, but rather had been with Defendant for about five years. His leave of absence accordingly was arranged pursuant to the written leave of absence policy which was previously cited in these proceedings.

**26.** *DEFENDANT'S RESPONSE:* This proposed finding is inaccurate and inconsistent with the testimony that Plaintiff cites in its support. Defendant's policy of entering contracts with the referenced individuals does not concern educational leaves of absence but rather participation in the Legal Education Program. The Legal Education Program involves continuing as an employee and attending law school part-time. As previously indicated, it was the alternative in which Plaintiff was not interested.

evidence "from which a jury might return a verdict in his favor." *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514.

■ In other words, the nonmoving party can defeat the motion by demonstrating the existence of a genuine dispute of material fact. A "genuine" factual issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party. *See Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510. Even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of his own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in his favor. Or, the nonmoving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of fact.

The court then considers the record to determine whether there are any material disputes of fact. A summary judgment procedure is not meant to be a trial on affidavits. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the summary judgment stage the judge's function is to determine whether there is sufficient evidence favoring the party having the burden of proof for a jury to return a verdict for that party. *See First National Bank of Arizona v. Cities Service Company,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). This inquiry implicates the substantive evidentiary standard of proof that would apply at a trial on the merits. Thus,

in a civil case such as this, the record must show that a jury could find by a preponderance of the evidence that the party upon whom the burden of proof is imposed is entitled to a verdict in his favor. *See Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. If that party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See, Id.* at 249–50, 106 S.Ct. at 2510–11.

Any reservations the court has concerning the evidence will preclude summary judgment. The court should enter summary judgment only if it appears from its review of the record evidence relied upon by the parties that the Defendant is entitled to summary judgment as a matter of law. Naturally, if the record is devoid of evidence necessary to sustain Plaintiff's burden of proof, the Defendant, which bears no burden at all, is entitled to a judgment in its favor.

## III. DECISION

### A. CHOICE OF LAW

■ In a case based upon diversity jurisdiction such as this, a federal court must apply the substantive law of the forum in which it sits, including the rules governing choice of law. *See International Administrators, Inc. v. Life Insurance Company of North America,* 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). Ziolkowski is urging the court to employ choice of law principles to rule that Illinois law applies in this case because Illinois has the most significant contacts with his causes of action. Illinois is the principal place of business of Defendant Caterpillar Corporation and the place where the contract negotiations between Caterpillar and Ziolkowski began. Wisconsin is the state to which Ziolkowski moved to attend law school and the place where the contract negotiations continued and ultimately broke down.

■ A court need resort to conflicts of laws rules only when the parties point to a difference among state laws which will make a difference to the outcome of the case. *See Id. See also R.E. Wood v. Mid-Valley Incorporated,* 942 F.2d 425, 426–27

(7th Cir.1991). In the instant case neither party has identified any outcome determinative conflicts between the laws of Illinois and the laws of Wisconsin. Therefore, the court need not address this issue and the laws of the forum—Wisconsin—will be applied.

### B. BREACH OF CONTRACT

■ Ziolkowski claims that Caterpillar breached the parties' oral contract under which Caterpillar would allow him to take an educational leave of absence from work to attend law school. Caterpillar would maintain his health insurance benefits and reimburse him for law school tuition as long as Ziolkowski returned to work for Caterpillar. In moving for summary judgment, the Defendant argues that: (1) the breach of contract claim is barred by the statute of frauds; and (2) that the intent of the parties was clearly that neither would be bound until they executed a written contract.

The Wisconsin Statute of Frauds provides that:

> (1) In the following case every agreement shall be void unless such agreement or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith:
>
> (a) Every agreement that by its terms is not to be performed within one year from the making thereof.

Wis.Stat. § 241.02(1)(a). The Defendant maintains that, even if there was a contract, it could not be performed within one year and, therefore, the contract claim is unenforceable under the statute of frauds. Because the parties never agreed upon the duration of the contract, it is unclear from the record whether the proposed agreement would provide for a leave of absence of one year which could be renewed or whether the leave would be for the full three years of law school. But, although the court cannot make this determination from the undisputed facts in the record, it will not be necessary to address this issue unless the court concludes that the parties had a legally binding oral contract.

■ In determining whether an oral contract exists, the court must determine that there was a meeting of the minds between the parties with respect to the terms of an agreement and that the parties intended to be bound to the oral agreement. *See M.T. Bonk Company v. Milton Bradley Company*, 945 F.2d 1404, 1407 (7th Cir.1991) (applying Illinois law); *Witt v. Realist, Inc.*, 18 Wis.2d 282, 297, 118 N.W.2d 85, 93 (1962). In order for an oral contract to be binding and enforceable, the contract terms must be definite and certain. *See M.T. Bonk Company*, 945 F.2d at 1407; *Witt*, 18 Wis.2d at 297, 118 N.W.2d at 93.

Looking at the evidence most favorable to Ziolkowski, the court concludes that there was no meeting of the minds between Ziolkowski and Caterpillar on a number of essential terms. Although Ziolkowski claims that, on August 8, 1990, he and Caterpillar Vice–Chairman James Wogsland entered into an oral contract governing his educational leave of absence, it is apparent from the continuing negotiations generated by Ziolkowski that there was no mutual assent to the terms of the agreement and that the terms of the agreement were not definite or certain or complete.

After commencing negotiations for an educational leave of absence contract with Caterpillar, Ziolkowski moved to Wisconsin to enroll in law school. Shortly after he arrived in Wisconsin, Caterpillar sent him a proposed written contract. This document, dated August 17, 1990, sets forth the terms of the leave of absence, then concludes as follows:

> If you agree that this letter accurately reflects the terms and conditions of your leave and if you are agreeable thereto, please sign the original of this letter where indicated having your signature notarized and return the signed original to us in the enclosed self-addressed, stamped envelope. A copy of the letter is provided for your files.

Deposition of Timothy J. Ziolkowski at Exhibit 9.

Ziolkowski signed the document, but appended and referenced a letter stating that:

This letter is intended to clarify item #5 of the enclosed endorsed agreement, per our telephone conversation of 8/30/90. The specific clarification is the third alternative of item #5 which states "(if you) do not return to fulltime employment, you will be expected to reimburse the company ...", which implies that if I do not return because the company does not offer me a position, I would still be liable for reimbursement. As you agreed, this was not the intention of the agreement.

It is agreed that there will be no reimbursement for items A, B, or C if the company does not offer me full-time employment in the Patent Department at a competitive salary, or if I am terminated, through no fault of my own, during the three year term of employment (i.e.; lay-off, etc.).

*Id.* at 10.

In a letter of October 1, 1990, Caterpillar accepted certain of Ziolkowski's suggestions, but stated that:

It is necessary to clarify your use of the phrase "competitive salary" as contained in your letter. It is Caterpillar's intention to offer employment within the existing salary range of entry level attorneys in the Patent Department at the time you complete your legal education. If you agree to this definition of "competitive salary", then that phrase may be used in connection with Caterpillar's required offer to you.

If these clarifications are acceptable, please so indicate by your signature and return the original of this letter to me no later than October 10, 1990.

*Id.* at Exhibit 12.

Ziolkowski responded on October 6, 1990, with the following demand:

In response to your letter of October 1, 1990, we are in agreement regarding the first paragraph; however, we disagree on the interpretation of the term "competitive salary."

Caterpillar's "existing salary range [for] entry level attorneys may not take into account my ten years of technical experience, of which directly applies to the field of patent law. My salary should not be the same as someone who does not have this prior experience, since it is this experience which makes my skills valuable. I sincerely wish to ratify our agreement and return to work for Caterpillar, but my judgment can not be impaired by my desire. I agreed to all of your stipulations, but to leave my salary at your sole discretion for a period of three years does not seem equitable. The educational expense reimbursement should not be reflected in my salary, because if it were, then I am ultimately paying for these benefits, which was not the true intent of our agreement.

The term "competitive salary", as used in my letter of September 6, simply means a fair salary which would closely match that of which I would receive in the market place.

*Id.* at Exhibit 13. In an October 16, 1990, reply, Caterpillar broke off negotiations and ended Ziolkowski's employment.

It is apparent from this correspondence that what Ziolkowski calls the "oral contract," formed during Ziolkowski's August 8, 1990 meeting with Vice Chairman James Wogsland, was merely an agreement to agree and, as such did not create binding obligations under Wisconsin law. *See Skycom Corporation v. Telstar Corporation*, 813 F.2d 810, 814 (7th Cir.1987); *Witt,* 18 Wis.2d at 298, 118 N.W.2d at 93–94.

■ Similarly, as the Defendant points out: "An acceptance requesting modification or containing terms that may vary from those offered constitutes a rejection of the original offer and becomes a counterproposal that must be accepted by the original offeror before a valid contract is formed." *Loeb v. Gray*, 131 Ill.App.3d 793, 798, 86 Ill.Dec. 775, 779–80, 475 N.E.2d 1342, 1346–47 (1985). *See also Leuchtenberg v. Hoeschler*, 271 Wis. 151, 153–54, 72 N.W.2d 758, 760 (1955).

In addition, the undisputed facts in the record show that the parties did not intend to be bound absent a written agreement. The negotiations indicate that a written document was contemplated at their con-

clusion. *See* Brief, Proposed Findings of Fact, and Appendix in Support of Defendant's Summary Judgment Motion at 8, ¶ 20. Ziolkowski agrees that the contract was to be committed to writing and signed by the parties. *See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at 2; Deposition of Timothy J. Ziolkowski at Exhibit 7.

As a result of this series of events, it is clear that the parties never reached a meeting of the minds on essential elements of the agreement and that there was no memorialization of any complete agreement in a writing executed by the parties. Accordingly, the court will grant summary judgment in favor of the Defendant on the Plaintiff's breach of oral contract claims.

## C. PROMISSORY ESTOPPEL

 In the alternative, the Plaintiff invokes the equitable doctrine of promissory estoppel by alleging that, because he justifiably relied upon promises made by the Defendant, he changed his position to his detriment by moving to Wisconsin to attend Marquette Law School. In order to prevail on a promissory estoppel theory, a party must prove that:

(1) there was a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promissee;

(2) the promise induced such action or forbearance; and

(3) injustice can be avoided only by enforcement of the promise.

*See Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 698, 133 N.W.2d 267, 275 (1965). *See also Derby Meadows Utility Company, Inc. v. Inter Continental Real Estate,* 202 Ill.App.3d 345, 360, 147 Ill.Dec. 646, 655, 559 N.E.2d 986, 995 (1990) (same elements under Illinois law). The party asking for estoppel bears the burden of establishing each of these elements by clear, concise and unequivocal evidence. *See Verdeyen v. Board of Education of Batavia Public School District No. 101, Kane County,* 150 Ill.App.3d 915, 929, 103 Ill.Dec. 620, 629, 501 N.E.2d 937, 946

(1986), *appeal denied,* 114 Ill.2d 558, 108 Ill.Dec. 426, 508 N.E.2d 737 (1987) (mem.).

In moving for summary judgment, the Defendant argues that any statement made by Caterpillar Vice Chairman James Wogsland during a brief meeting on August 8, 1990, with Ziolkowski "was not a promise that Wogsland should have reasonably expected to induce Plaintiff to leave his employment for law school and that it need not be enforced to avoid injustice." Brief, Proposed Findings of Fact and Appendix in Support of Defendant's Summary Judgment Motion at 18. The Defendant also argues that any promise made by Wogsland at the meeting was not unconditional, but was expressly conditioned upon working out definite terms for the leave of absence with Wayne Zimmerman, Caterpillar's Vice President, Human Services. *See Id.* at 19. *See also* Brief, Proposed Findings of Fact and Appendix in Support of Defendant's Summary Judgment Motion at 6, ¶ 16. As explained above, the consummation of negotiations was also conditioned upon a memorialization of the agreement in a writing executed by the parties.

Ziolkowski, in turn, argues that following the August 10 meeting, he believed that Caterpillar had agreed to grant him a leave of absence, to reimburse him for law school tuition, and to maintain his health benefits. The Plaintiff says that, in reliance upon these promises, he left his employment, moved to Milwaukee, and enrolled in law school.

The undisputed facts in the record show that Ziolkowski took the Law School Admission's Test in 1989, before he joined Caterpillar in January of 1990. He applied for Marquette Law School in March of 1990 and was accepted in April of that year for admission to the class matriculating in the fall of 1990. Ziolkowski took these steps despite the fact that, in general, Caterpillar did not grant educational leaves of absence until an employee had been with the company for at least a year. *See* Appendix to Defendant's Motion for Summary Judgment at 1. In addition, in July of 1990, Ziolkowski accepted a check from a co-employee which was meant to be a deposit

on a sublease of Ziolkowski's Illinois home. *See* Deposition of Timothy J. Ziolkowski at Exhibit 6.

Despite this evidence, Ziolkowski denies that he would have moved to Wisconsin to enroll in law school had he not relied upon Caterpillar's promises. However, there is no evidence in the record that Caterpillar induced Ziolkowski to take a three-year educational leave of absence to attend law school after less than seven months of employment with the Defendant. Indeed, Caterpillar turned down his initial request.

Although Ziolkowski assumed he had such a deal, his reliance was unreasonable. He had not completed negotiations and was not willing to accept Caterpillar's terms without modification. Moreover, the alleged promises were made during an informal, brief meeting between Wogsland and Ziolkowski. A formal written contract was intended by both parties. Consequently, it was unreasonable for Ziolkowski to act in reliance upon the "promises" until a formal and more detailed written contract had been executed. *See Gruen Industries, Inc. v. Biller*, 608 F.2d 274, 281 (7th Cir. 1979).

 Finally, the Defendant argues that Ziolkowski has not shown that he has suffered from acting in reliance. The court agrees. Caterpillar has not been unjustly enriched and Ziolkowski, who has not sought reinstatement, merely has to repay another lender for his student loan rather than Caterpillar.[27] *See Silberman v. Roethe*, 64 Wis.2d 131, 143–47, 218 N.W.2d 723, 729–31 (1974).

Therefore, because any reliance upon Ziolkowski's part was unreasonable and because the alleged promises need not be enforced to avoid injustice, the court concludes that Ziolkowski cannot recover under a theory of promissory estoppel. Therefore, summary judgment will be granted in favor of the Defendant on this claim.

---

**27.** Caterpillar's reimbursing Ziolkowski for tuition and maintaining health benefits was conditioned upon Ziolkowski returning to work for the company.

## ORDER

For the reasons explained above, the court ORDERS that Caterpillar Inc.'s "Motion for Summary Judgment" (filed May 1, 1992) IS GRANTED.

IT IS FURTHER ORDERED that this action is dismissed upon its merits.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 58, the Clerk of Court shall enter a final judgment as a separate document. This judgment shall provide that:

This action came on for hearing before the Court, Honorable Thomas J. Curran, District Judge, presiding and the issues having been heard and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED

that Plaintiff Timothy J. Ziolkowski take nothing and that this action is dismissed upon its merits.

Done and Ordered.